# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

**GARY D. MULLIS,** : 
: 
    **Plaintiff,** : 
:     **CIVIL ACTION FILE NO.**
**v.** :     **1:07-CV-1986-AJB**
: 
**MICHAEL J. ASTRUE,** : 
*Commissioner of Social* : 
*Security Administration,* : 
: 
    **Defendant.** : 

## O R D E R  A N D  O P I N I O N[1]

Plaintiff Gary Mullis brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying his application for Social Security Supplemental Security Income ("SSI").[2] For the reasons set forth below, the undersigned **AFFIRMS** the decision of the Commissioner.

---

[1] The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73. [Docs. 2, 3]. Therefore, this Order constitutes a final Order of the Court.

[2] Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq.*, provides for supplemental security income for the disabled.. Title XVI claims are not tied to the attainment of a particular period of insurance eligibility. *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982).

## I.    Procedural History

Plaintiff filed an application for SSI payments on November 20, 2003, alleging disability commencing on June 5, 1989. (R79-82). The application was denied initially, (R30-32), and on reconsideration. (R36-38).

Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"). (R42). An evidentiary hearing was held on October 18, 2005, (R385-416), and a supplemental hearing was held on May 9, 2006, (R417-428). Thereafter, the ALJ issued a "Notice of Decision-Unfavorable," dated September 28, 2006, denying Plaintiff's claims on the grounds that Plaintiff retained the Residual Functional Capacity ("RFC") to perform medium exertion work[3] that does not require overhead use of the upper extremities. (R14-27). Plaintiff then requested review by the Appeals Council. (R7-8). The Appeals Council denied the request concluding that the additional information provided did not provide a basis for changing the decision of the ALJ, thereby making the ALJ's decision the final decision of the Commissioner. (R9-11).

---

[3]     Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If the claimant can do medium work, the claimant is deemed to be able to perform sedentary and light work. 20 C.F.R. § 220.132(c).

AO 72A
(Rev.8/8
2)

Plaintiff, having exhausted all administrative remedies, filed this action on August 18, 2007. (Doc. 1). The Commissioner filed the transcript of the administrative proceedings on November 30, 2007. (Doc. 6). The matter is now before the undersigned upon the administrative record, the parties' pleadings, briefs and oral argument, and is ripe for review pursuant to 42 U.S.C. § 405(g).

## II.     Plaintiff's Contentions

As set forth in Plaintiff's brief, the issues to be decided are as follows:

1.     The ALJ committed reversible error in not tendering the post-hearing evidence of Mullis' updated earnings record to him for comment, prior to relying on this evidence in denying this claim, as required by HALLEX I-2-7-1.

2.     The ALJ's finding that Mullis' depression is not a severe impairment and does not result in any functional limitations is not supported by substantial evidence.

3.     The ALJ failed to sustain the Commissioner's burden of establishing that there is other work in the national economy that Mullis can perform.

[Doc. 11 at 1].

AO 72A
(Rev.8/8
2)

## III. Statement of Facts

### A. Background Information

Plaintiff was born on December 30, 1958, (R79), and was 57 years old at the time of the hearing. (R18). Plaintiff has a high school education. (R106). His past relevant work is as a telemarketer and wholesale food salesperson. (R18, 103). Plaintiff alleges disability based upon a hernia, high blood pressure, diabetes mellitus, depression, and neck and back pain. (R18, 102).

### B. Medical Records

The medical evidence is comprised of records from: (1) Kennestone Outpatient Clinic; (2) Grady Health Systems; (3) Acworth Primary Care; (4) Kennestone Hospital; (5) A-1 Medical Center; (6) Cobb Douglas Community Service Board; (7) Sudano Family Chiropractic; (8) the Georgia Pain Clinic; and (9) Long's Eye Care and Hearing Center.

Review of these records discloses that on July 23, 2003, Plaintiff was seen at the Kennestone Hospital Emergency Room ("ER") for neck and back pain following a fall. (R212-22). Lumbar spine x-rays revealed "marked" degenerative changes and cervical spine x-rays showed degenerative changes at C4-5 with anterior spurring, and degenerative changes at C6-7. (R219). Plaintiff appeared at the ER again on three

4

separate occasions on November 16, 17, and 19, 2003, for elevated blood sugar and testicular pain; right groin pain, and abdominal pain. (R133-58, 191-211). After finding bilateral inguinal hernias, Jeffrey Schwab, M.D., performed surgical hernia repair on December 30, 2003. (R132, 187-90, 226-28). Plaintiff tolerated the procedure well. (R187-90, 226-27). Plaintiff again appeared at the ER on January 3, 2004, requesting pain medication. (R160-63).

On February 12, 2004, Plaintiff returned to the ER again with complaints of dizziness and abdominal pain at the hernia repair site. (R160-63, 178-86). He refused blood work and only wanted pain medication. (R184). At that time, his diagnoses were myalgias,[4] atypical chest pain, and hyperglycemia.[5] (*Id.*).

Plaintiff was also seen at Acworth Primary Health Care clinic on January 16, 19, and 26, 2004, and February 9, 2004, for similar complaints of groin and testicular pain. (R173-77).

---

[4]    Myalgia means muscle pain. There are many specific causes of various types of myalgia. Myalgia can be temporary or chronic. http://www.medterms.com/script/main/art.asp?articlekey=12008 (last visited August 19, 2008).

[5]    Hyperglycemia is the technical term for high blood glucose (sugar). http://www.diabetes.org/type-1-diabetes/hyperglycemia.jsp (last visited August 19, 2008).

AO 72A
(Rev.8/8
2)

On February 20, 2004, Plaintiff was seen at Summit Surgical Specialists for complaints of viral symptoms and right groin pain. (R224). It was noted that he had been driving a truck and had been pushing the pedal a lot. The examining physician felt that Plaintiff suffered from muscle strain caused by his increased post- surgery activity. Plaintiff requested pain medicine, but was advised that a strong narcotic was not appropriate eight weeks post-surgery. Instead, he was given a prescription for Darvocet. (*Id.*).

On April 28, 2004, Nurallah Esmail, M.D., at A-1 Medical Center, examined Plaintiff and noted he had decreased hearing, elevated blood sugar of 241, acid reflux, hemorrhoids, neck and low back pain, straight raising on the right of 60 degrees, tenderness of the cervical and lumbar spine, and that he "keeps on talking." (R247-50). Plaintiff also was noted to be a 20 year "marijuana addict." (R247). Dr. Esmail's diagnoses were diabetes mellitus; left chest mass, tender to touch; and status post bilateral inguinal hernia repair. (R250).

Kennestone Hospital records reflect that Plaintiff received treatment on October 7, 2004, for chronic neck pain and a chest cyst. (R316-21). Cervical and lumbar spine x-rays dated October 12, 2004, revealed "bulky calcification of the anterior longitudinal ligament at C4-5 as well as C6-7," and a "possible mild loss of anterior vertebral body

6

height of the T11 vertebral body." (R267-68). On February 14, 2005, Plaintiff was seen by Dr. Brownlow for a diabetes follow-up, complaints of neck and abdominal pain, and a cough. (R309-14). He also had an excision of a left anterior chest wall mass on April 28, 2005. (R306-08).

Plaintiff was treated by Nicholas Sudano, D.C., from June 4 through October 19, 2004, for complaints of pain, stiffness, and muscle spasms in the cervical and lumbar spine areas, which were exacerbated by activity. (R270, 276, 277). Upon examination, Dr. Sudano found moderate levels of tenderness, pain, spasms, misalignment and/or subluxation at C1, T4, L5, C6, and T7, and decreased ranges of motion. (*Id.*) In October 2004, Dr. Sudano wrote that he believed that Plaintiff's spine condition was directly related to his fall from a bunk bed at the Douglas County Detention Center. (R272). Dr. Sudano noted severe trauma to the spine, especially in the neck and low back areas which caused vertebrae misalignment, ligaments and muscles to be overstretched, nerves to be irritated and various soft tissue to be inflamed. (R272, 274). Dr. Sudano also stated that "the likelihood of future accelerated . . . degenerative change in the involved joints is certainly a significant one." (R273, 275).

Dr. Sudano re-evaluated Plaintiff on October 17, 2005. (R323). Examination at the time revealed: head tilt to the right, severe restriction in cervical ranges of motion

AO 72A
(Rev.8/8
2)

in extensions and bilateral flexion, moderate restriction in right and left rotation, palpated muscle tenderness on the right and left, severe hypomobile joint dysfunction at C5-C7, and bilateral paraspinal muscle spasm at C5-C7. (*Id*.). Dr. Sudano noted that June 2004 x-rays showed disc degeneration and anterior spur formation at C5-C7 and decreased cervical lordosis. (*Id.*) His specific diagnoses were neck pain, cervical subluxation, brachial neuritis,[6] and degeneration of cervical intervertebral disc. (*Id.*).

George Brownlow, M.D., of the Georgia Pain Clinic, first evaluated Plaintiff on November 11, 2004. (R298-304). Plaintiff's complaints included headaches, as well as poor sleep, night sweats, chest pain, numbness in lower abdomen, weakness, depression, anxiety, and recurrent chest infections. (R298-99). Dr. Brownlow's examination revealed "70% of normal extension" of cervical spine, deep tendon reflexes of 2/4, bilaterally, 0/4 reflexes of the right patella and 2/4 of the left patella, 1/4 reflexes of bilateral Achilles, and left arm tenderness over the brachial radialis.[7]

---

[6]     "Brachial neuritis" is a common neuromuscular condition characterized by the acute onset of excruciating unilateral shoulder pain, followed by flaccid paralysis of shoulder and parascapular muscles. http://www.diseasesatoz.com/brachial-neuritis.htm (last visited August 20, 2008).

[7]     The "brachial radialis" is a muscle with its origin in the lateral supracondylar ridge of the humerus, with insertion to the front of the base of the styloid process of the radius, with nerve supply from the radial nerve, and whose action flexes the forearm. http://medical-dictionary.thefreedictionary.com/Brachioradialis+muscle

(R300). Plaintiff was diagnosed with chronic neck pain/cervical spondylosis,[8] left arm pain, strained brachial radialis, and mild low back pain. (*Id*.)

Plaintiff was seen again at the Pain Clinic in December 2004, January 2005, and February 2005, with continued pain complaints. (R292-97). In December 2004 and January 2005, Plaintiff's diagnoses included chronic opioid therapy,[9] cervical spondylosis, cervicalgia, and headaches. (R294, 296). In February 2005, it was noted that Plaintiff had "a pain pattern in areas consistent with trigger points", i.e., in the cervical paraspinals and sternocleidomastoid,[10] which were injected. (R293). Dr. Brownlow informed Plaintiff on April 4, 2005, that he would no longer serve as his

---

(last visited August 20, 2008).

[8] Cervical spondylosis is a general term for age-related wear and tear affecting the joints in your neck. Also known as cervical osteoarthritis, this condition usually appears in men and women older than 40 and progresses with age. http://www.mayoclinic.com/health/cervical-spondylosis/DS00697 (last visited August 20, 2008).

[9] Opioids are any morphine-like synthetic narcotics that produce the same effects as drugs derived from the opium poppy (opiates), such as pain relief, sedation, constipation and respiratory depression. http://medical-dictionary.thefreedictionary.com/Opioid (last visited August 20, 2008).

[10] Sternocleidomastoid ("SCM") is one of two muscles located on the front of the neck which serve to turn the head from side to side. http://medical-dictionary.com/dictionaryresults.php (last visited September 29, 2008).

treating physician "due to the personality conflict and no compliance with the treating physician." (R287).

Mental health treatment records from Cobb Community Outpatient and Community Services ("CCOCS"), dated from December 16, 2004, through August 10, 2005, document Plaintiff's social services assistance as well as mental health therapy relative to his depressive disorder, NOS. (R324-67). Plaintiff was initially seen at CCOCS on December 16, 2004, for assessment of his depression, when it was noted that he was " hard of hearing." (R359). Thereafter, Plaintiff attended one group therapy session, but did not follow through with further assessment and treatment. (R348-59). Instead, Plaintiff demanded that his disability paperwork be completed. (R355).

On June 16, 2005, Plaintiff underwent an assessment with Christy Mull, LPC, who diagnosed Depressive Disorder, NOS, and assessed a current GAF of 38, with a high of 48 in the past 12 months.[11]  (R348-54). Plaintiff was described as needing

---

[11]    The Global Assessment of Functioning (GAF) is a numeric scale (0 through 100) used by mental health clinicians and doctors to rate the individual's overall level of functioning. A GAF score of 48 indicates serious symptoms (e.g.,suicidal ideation, severe obsessive rituals, frequent shoplifting) or serious impairment in social, occupational or school functioning (e.g.,no friends unable to keep a job). A GAF score of 38 indicates some impairment in reality testing or communication (e.g. speech is at times illogical, obscure or irrelevant) or impairment

AO 72A
(Rev.8/8
2)

community support in many areas and was experiencing moderate to frequent depressed mood, feelings of worthlessness, social withdrawal, appetite changes, changes in energy level, sleep disturbance, decreased concentration, medical complications, chronic pain, insight deficit, and memory deficit.  (R348, 350-54).

Plaintiff met with therapist Jean Taylor on July 6, 2005, and was observed to be "unkempt," anxious and irritable, with pressured speech, restlessness, and limited insight and judgment.  (R346).  The same day, case manager Warner Strickland met with Plaintiff at the home of his friend, "Joe," and arranged for them to receive food from the food bank the following day.  (R345).  Subsequent numerous visits were made and Plaintiff was provided with necessities, including a tent and sleeping bags, by Strickland or other community service personnel.  (R324, 325, 327-30, 333-35, 337, 339, 342-44).  On July 21, 2005, Strickland noticed that Plaintiff was "hard of hearing." (R332).

On July 25, 2005, Plaintiff met with psychiatrist Anthony Ekwenchi, M.D., who noted that Plaintiff felt his Prozac and Vistaril were "help[ing] diminish the severity of

_____

in several areas such as work or school, family relations, judgment, thinking, or mood (e.g. depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing school). *Diagnostic and Statistical Manual of Mental Disorders* 32-34 (4th ed., Text Revision, 2000) ("DSM-IV").

AO 72A
(Rev.8/8
2)

his depression and improve functioning." (R331). Dr. Ekwenchi noted that Plaintiff "[h]as mood swings and racing thoughts and irritability," and "[h]ears the sound of a tractor when he is tired." (*Id.*). He observed Plaintiff to be "hyperverbal," with a blunted affect, sad mood, and fair insight and judgment. (*Id.*).

Dr. Ekwenchi completed a Mental Impairment Questionnaire form dated August 5, 2005. (R261-66). He indicated that Plaintiff was responding favorably to medication, but continued to experience depression and anxiety. (R261). His GAF score was 48. (R261), Dr. Ekwenchi diagnosed Plaintiff with Depressive Disorder, NOS, diabetes with complications, and indicated that Plaintiff's psychiatric condition exacerbated his neck and back pain complaints. (R261, 264). He indicated further that Plaintiff had moderate limitations in maintaining social functioning and marked limitations in concentration, persistence or pace, and four or more episodes of decompensation. (R264). Dr. Ekwenchi opined that Plaintiff's impairments would cause him to be absent from work about two days per month. (R265).

Plaintiff underwent a consultative audiological evaluation with Laurie Nelson, M.S., CCC/A, on November 29, 2005. (R369-71). Results of testing showed severe bilateral hearing loss. (R369, 370). Ms. Nelson commented that "Mr. Mullis clearly has difficulty hearing and understanding speech unaided at conversational levels," and

12

that even with binaural hearing aids, "hearing and understanding speech in adverse environments (i.e. noise) may be difficult." (R369). She recommended further evaluation by an otolaryngologist "due to asymmetric hearing loss and word recognition scores to rule out retrocochlear pathology." (R370).

When State agency audiologist, Robin Alverson, MMS, CCC-A, reviewed Nelson's report on December 7, 2005, she concluded that Plaintiff's "hearing loss is more than non severe, but does not reach listing level severity." (R368). She recommended that an RFC be done with no environments that required Plaintiff to have very sensitive hearing. (*Id.*). She also opined that verbal instructions would be heard best when presented in a quiet, face to face communicative situation with hearing aids in place. (*Id.*).

State agency medical consultants reviewed the evidence available in January and July 2004, and completed physical RFC assessment forms. (R164-72, 253-60). On January 19, 2004, Luis Suarez, Jr., M.D., determined that Plaintiff could frequently lift up to 25 pounds, stand/walk for six hours out of an eight hour work day and sit six hours out of an eight hour work day. (R165). Plaintiff was limited to occasional postural activities, except for balancing, which he could do frequently. (R170). On the July 12, 2004, an RFC assessment was completed by Hector Manlapas, M.D., who

13

found that Plaintiff could frequently lift 25 pounds, stand/walk for six hours out of an eight hour work day and sit six hours out of an eight hour work day. (R253-60). Dr. Manlapas found that Plaintiff had no postural limitations. (*Id.*).

C. *Evidentiary Hearing Before the ALJ*

Plaintiff was 56 years old at the time of the first hearing before the ALJ. (R390). He testified that he had been homeless and living in a tent since November 16, 2003, when he was released from the Cobb County Adult Detention Center. (R391). He testified that his past work was in wholesale food sales. (R403). Plaintiff testified that after he was released from jail, he could not walk extensively without pain due to a bilateral inguinal hernia. (R392). Plaintiff further testified that he is in constant pain with his neck. (R395). According to Plaintiff, when his "neck goes out," he cannot "think straight" and "I get- - my depression, from not having no income and no- having to sleep in a tent and unable to earn an income has caused severe depressions." (*Id.*). Plaintiff also testified that he experiences crying spells three or four times a week and that he cannot concentrate when his "neck goes out." (R395-96).

Plaintiff testified that he has made several attempts to work at places such as Wendy's and McDonald's, but "they wouldn't hire me because I had a felony or because I was homeless, or you know, maybe because I am 60 years old and a lot of

14

pains and disabilities." (R397). Plaintiff also testified that he cannot sit down for more than twenty minutes without having to readjust. (R398). He also has shooting pain in his elbow. (R402). Plaintiff further testified that he is unable to concentrate due to his depression. (R398). In addition, Plaintiff testified that he does not take his diabetes medication because he cannot afford it. (R399).

Plaintiff's friend, Charles Rogers, testified that he has known Plaintiff since 1998 and sees him anywhere from 3 to 7 days a week. (R407). Rogers testified that he has tried to employ Plaintiff in his business but found that Plaintiff kept having problems with pain in his neck, arm and head where he would have to go lay down. (R407-08). Rogers also testified that Plaintiff could not drive his vehicles because the pain made him incoherent. (R409).

The vocational expert ("VE") testified that Plaintiff's past relevant work as a telemarketer was a sedentary, semi-skilled position. (R411). His past relevant work as a wholesale foods representative was classified as light work. (*Id*.).

The ALJ posed three hypothetical questions to the VE. He first asked whether a hypothetical person of Plaintiff's age, education and work experience, with the capacity to perform light exertional work, a need for face-to-face contact and a need to avoid overhead use of his upper extremities could perform any of the Plaintiff's past

AO 72A
(Rev.8/8
2)

relevant work. (R412). The VE testified that such a person could not perform any of Plaintiff's past relevant work. (*Id*.). The VE also testified that the same individual, using a telephone with amplification, could perform Plaintiff's past relevant work as a telemarketer, (*Id.*), and also could perform the wholesale foods representative job. (R413). The VE further testified that such an individual who was limited to stooping only occasionally could perform the telemarketer job. (*Id*.). However, the VE concluded that Plaintiff could not do any of his past work, or any other work, if Dr. Ekwenchi's August 5, 2005, mental impairment was incorporated into the hypothetical. (R413-14).

At the May 9, 2006, supplemental hearing, the ALJ posed additional hypotheticals to a different VE. (R417-29). The VE first concluded that a person of Plaintiff's age, education, and work experience, could not perform any of the Plaintiff's past relevant work if the person had the following limitations: (1) light exertional work, (2) no use of his upper extremities overhead, (3) avoid environments that require very sensitive hearing, (4) verbal instructions would be best heard when presented in a quiet face-to-face communicative setting, and (5) with hearing aids. (R422). The VE opined that the same individual capable of medium exertional work could perform the medium, unskilled jobs of kitchen helper, hospitality housekeeping, and hand packager. (R424).

16

She also testified that if the person could only occasionally stoop, such an individual could possibly perform the job of hand packager. (*Id.*). The VE also requested to do some research on other jobs such an individual might be able to perform. (R425). This VE also testified that Plaintiff could not do any of his past work, or any other work, if Dr. Ekwenchi's August 5, 2005, mental impairment was incorporated into the hypothetical. (R426-27).

Following the May 2006 hearing, the VE opined that an individual with the RFC to perform medium, unskilled work with occasional stooping, no overhead reaching, sensitive hearing, and a quiet face-to-face communicative work situation could not perform any jobs in the national economy. The basis of her opinion was that "when a person is given this arduous an exertion level, is restricted to both overhead reaching and occasional stooping, and [ ] sensitive hearing, the job base is severely eroded." (R130).

## IV. The ALJ's Findings of Fact

The ALJ made the following findings of fact:

1.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

2.  The claimant's diabetes mellitus, residual effects of hernia repair, hearing loss, and degenerative disc disease of the cervical and

lumbar regions of the spine are considered "severe" based on the requirements in regulations (20 CFR § 416.920(c)).

3.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4.  The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

5.  The claimant has the residual functional capacity to perform medium exertion that does not require overhead use of the upper extremities. He should avoid environments that require sensitive hearing. He needs instructions communicated face-to in a quiet environment, preferably with the use of hearing aids.

6.  The claimant is unable to perform any of his past relevant work (20 CFR § 416.965).

7.  The claimant is an individual approaching advanced age as of November 20, 2003, and is considered to be of advanced age as of December 29, 2003 (20 CFR § 416.963).

8.  The claimant has a "high school education" (20 CFR § 416.964).

9.  The claimant has no transferable skills from any past relevant work (20 CFR § 416.968).

10. The claimant has the residual functional capacity to perform a significant range of medium work (20 CFR § 416.967).

11. Although the claimant's additional non-exertional limitations do not allow him to perform the full range of medium work, using Medical Vocational Rule 203.15 as a framework for the decision-

AO 72A
(Rev.8/8
2)

making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs include work as a kitchen helper, hospital housekeeper, and hand packager. There are thousands of each of these jobs in the Georgia economy, and hundreds of thousands in the national economy.

12. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 416.920(g)).

(R26-27).

The ALJ determined that Plaintiff was not disabled at any relevant time prior to her decision. (R27). In making this determination, the ALJ first summarized the hearing testimony and Plaintiff's medical records. (R19-22). In this regard, she noted an inconsistency between Plaintiff's claim of inability to work and his claim to Dr. Schwab that work exacerbated his pain (as well as Plaintiff's friend's statement to a mental health counselor that Plaintiff had been working and Rogers' testimony that Plaintiff did poor work for him). (R18-19).

The ALJ noted that as of January 2004, the hernia repair was well-healed, and that he reported to Dr. Schwab that he was working in February 2004. (R20). Dr. Schwab prescribed pain medication but recommended Advil for the muscle strain. (*Id.*). The ALJ further observed that when Dr. Esmail saw Plaintiff in April 2004, Plaintiff was described as having full muscle power and tone, without atrophy or

19

spasm; his joints were normal and range of motion was good although he had tenderness on flexion of the neck and in the lumbar spine on range of motion; his shoulders and spine were otherwise normal; and he was neurologically intact without signs of radiculopathy. (*Id.*). A mental examination indicated no depression and good memory and concentration. While his diabetes was in poor control, he was given medication and glucose monitoring supplies. He was given a referral for his hearing problem "as he was said to have slight problems hearing certain words." (R21).

The ALJ also noted that Dr. Sudano's treatment between June and August 2004 was an indication of Plaintiff's neck and back pain, but his opinions were not afforded significant weight. (*Id.*). The ALJ then observed that Plaintiff went to the ER for pain medication without any significant new medical findings. While x-rays in October 2004 showed calcification at C4-5 and C6-7, lumbar spine x-rays showed well-preserved disc spaces with possible mild loss of height at T11. The ALJ also discussed Dr. Brownlow's records supporting Plaintiff's complaints, but noted that in December 2004, when Plaintiff requested pain medication, he was given non-narcotic medications. In April 2005, Plaintiff was discharged from Dr. Brownlow's practice due to a "personality conflict" and failure to comply with the treating physician. (*Id.*).

20

As for Plaintiff's claims of depression, the ALJ noted that Plaintiff was seen two times in early 2005 and in group therapy, blamed the government for his depression. His case was closed for failure to follow through with treatment. He had not seen a psychiatrist and threatened legal action against the counselor if his mental health questionnaire was not completed. (*Id.*). Despite this, he reestablished treatment at the center, and while his attitude was described as "very negative," he cooperated in efforts to obtain housing, employment and medical care. (R21-22). The ALJ noted that Dr. Ekwenchi's questionnaire was completed after only one visit with a psychiatrist at the center, although the assessment stated that he had been seen twice monthly for of a depressive disorder. (R22). The ALJ rejected Dr. Eckwenchi's conclusions on the grounds that, being completed after only one visit, the assessment lacked longitudinal history. The ALJ also stated that the mental health notes showed that Plaintiff rejected treatment for depression, threatened staff members who failed to cooperate with his requests for disability documentation "and used the agency for a as a source for food and assistance while he remained homeless (despite having friends and jobs.") (R22). The ALJ concluded that viewing Plaintiff's mental status in light of the entire medical record, there was little evidence of depressive symptoms: "When taking medicine as prescribed (and not pursuing narcotic pain medications) [Plaintiff] is clearly able to

21

function in terms of daily activities, social functioning, and concentration, persistence and pace with no more than mild limitations.  There is no evidence of decompensation of extended duration." (*Id.*).  She also noted that Plaintiff had an audiological assessment after the first hearing, which resulted in a finding that with hearing aids, he had speech recognition of 84%. (*Id.*).  She then noted that she considered the state agency consulting audiologist's and physicians' assessments of Plaintiff. (R22-23).

The ALJ also found that Plaintiff's complaints were not fully credible due to his admitted history of substance abuse and his continual seeking of medical treatment for relatively minor pain complaints, while requesting prescription pain medication. (R23).  Additionally, the ALJ noted that Plaintiff was discharged by Dr. Brownlow for failure to comply with prescribed treatment and personality conflicts and was affirmatively advised that no narcotic pain medications would be prescribed. (*Id.*).

The ALJ also concluded that despite Plaintiff's allegations of multiple illnesses, pain, and depression, he had been able to drive a truck during most of the period of evaluation. (*Id.*).  The ALJ also found that Plaintiff had worked "rather unsuccessfully" cleaning carpets and furniture in July 2005, and wages were reported by Comprehensive Medical Care in the fourth quarter of 2004 and by Ripley

22

Entertainment for the fourth quarter of 2005 and the first quarter of 2006. (*Id*). Plaintiff was also noted to be a spokesman for a children's advocacy group. (R24).

The ALJ further wrote that Plaintiff's primary mission at mental health centers appeared to have been obtaining a mental health questionnaire, which was finally completed by Dr. Ekwenchi after Plaintiff "browbeat[ ] a counselor." (*Id*.). The ALJ observed that Plaintiff only went to one group therapy session, complained that his depression was caused by the government, and then refused group therapy and accepted only community support services. (*Id*.).

The ALJ also observed that there was "scant evidence" of ongoing impairments that resulted in more than minimal functional limitations. (*Id*.). The ALJ pointed out that examinations by Drs. Brownlow and Esmail showed few objective findings, primarily just slightly limited range of motion of the cervical spine, and sometimes slight tenderness in the lumbar spine; he had normal muscle power and tone with normal reflexes and neurological functioning; and he had a normal gait. (*Id*.). Additionally, the ALJ observed that Plaintiff's primary motivation on several office visits to Dr. Brownlow and his local emergency room appeared to be for obtaining narcotic pain medication. (*Id*.).

23

The ALJ observed that the VE found that an individual with Plaintiff's age, background and the RFC to perform medium exertion work that does not require overhead use of the upper extremities, avoiding environments that require sensitive hearing, and instructions communicated face-to-face in a quiet environment, preferably with the use of hearing aids, could not perform his past relevant work but could perform work that existed in the national economy. (R26). As a result, the ALJ found that the Plaintiff was not disabled. (*Id.*).

## V. STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of

24

substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner. The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. § 404.1512(a). The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability. *See* 20 C.F.R. § 404.1520(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The claimant must prove at step one that he is not undertaking substantial gainful activity. *See* 20 C.F.R. § 404.1520(b). At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments which significantly limits his ability to perform basic work-related activities. *See* 20 C.F.R. § 404.1520(c). At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education and work experience. *See* 20 C.F.R. § 404.1520(d). At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that the impairment prevents performance of past relevant work. *See* 20 C.F.R. § 404.1520(e). At step five, the regulations direct the Commissioner to consider the claimant's residual

25

functional capacity, age, education and past work experience to determine whether the claimant can perform other work besides past relevant work. *See* 20 C.F.R. § 404.1520(f). The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists. *Doughty*, 245 F.3d at 1278 n.2.

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. *See* 20 C.F.R. §§ 404.1520(a) and 416.920(a). Despite the shifting of burdens at step five, the overall burden rests upon the claimant to prove that she is unable to engage in any substantial gainful activity that exists in the national economy. *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983).

## VI.    SCOPE OF JUDICIAL REVIEW

The scope of judicial review of a denial of Social Security benefits by the Commissioner is limited. Judicial review of the administrative decision addresses three questions:  (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues. *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980).

AO 72A
(Rev.8/8
2)

This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. If supported by substantial evidence and proper legal standards were applied, the findings of the Commissioner are conclusive. *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). "Substantial evidence" means more than a scintilla, but less than a preponderance. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and it must be enough to justify a refusal to direct a verdict were the case before a jury. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239. "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). In contrast, review of the ALJ's application of legal principles is plenary. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

27

## VII.   ANALYSIS OF CLAIMS OF ERROR

### A.   *Hallex*[12]

Plaintiff argues that the ALJ failed to tender updated earnings records to him and his counsel as required by HALLEX I-2-7-1.  (Doc. 11 at 15).  Specifically, Plaintiff argues that he was prejudiced by the ALJ's failure to tender his updated earnings record to him for comment.  (*Id.*).

The Commissioner responds that there was no need to proffer to Plaintiff and his counsel the updated earnings record obtained, after the hearing, from the Agency's database.  (Doc. 13 at 3-4).  The Commissioner argues that Plaintiff's late 2005 and early 2006 earnings did not figure heavily into the ALJ's decision because she relied on evidence of other work activity, Plaintiff's role as a spokesman for a children's rights group, Plaintiff's participation in a downtown rally, Plaintiff getting "fired" as a patient for non-compliance, and Plaintiff's angry insistence that staff at a mental health facility complete an assessment form.  (*Id*. at 5).  Additionally, the

---

[12]     HALLEX is the Hearings, Appeals and Litigation Law manual.  It "conveys guiding principles, procedural guidance and information to the Office of Hearings and Appeals (OHA) staff," "includes policy statements," and "defines procedures for carrying out policy and provides guidance for processing and adjudicating claims at the Hearing, Appeals Council and Civil Actions levels." HALLEX I-1-0-1.

AO 72A
(Rev.8/8
2)

Commissioner argues that Plaintiff was already in possession of the information because he was obligated to report any income he earned after his November 20, 2003, application, and he was advised that the Agency would check his statements regarding his income and resources and compare the agency's records with records from other state and federal agencies, including the Internal Revenue Service. (*Id*. at 5).

The Eleventh Circuit has never addressed whether the Commissioner's failure to follow HALLEX is grounds for remand. The Ninth Circuit has determined that HALLEX does not carry the force of law, so it is not binding on the agency and correspondingly does not create judicially enforceable duties. *See Parra v. Astrue*, 481 F.3d 742, 749 (9th Cir. 2007). As a result, the Ninth Circuit does not review allegations of noncompliance with HALLEX. *Id.*; *Moore v. Apfel*, 216 F.3d 864, 868-69 (9th Cir. 2000).

Similarly, the Fifth Circuit agrees that HALLEX does not carry the authority of law. *Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000). The Fifth Circuit will review, however, allegations that the Commissioner erred in following procedures in HALLEX, but will only find reversible error where the claimant shows that he "was prejudiced by the agency's failure to follow a particular rule." *Shave v. Apfel*, 238 F.3d 592, 597 (5th Cir. 2001). This is because the Fifth Circuit previously has "held that 'where the

29

AO 72A
(Rev.8/8
2)

rights of individuals are affected, an agency must follow its own procedures, even where the internal procedures are more rigorous than otherwise would be required.' "
*Newton*, 209 F.3d at 459 (quoting *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. Unit A Sept. 9, 1981)).

For purposes of Plaintiff's case, the Court assumes that the Fifth Circuit's prejudice standard applies and considers Plaintiff's HALLEX argument.[13] The Court finds, however, that this argument does not provide grounds for relief because Plaintiff did not suffer any prejudice.

---

[13] The Court observes that the Eleventh Circuit might follow the Fifth Circuit standard. In holding that a violation of a HALLEX procedure may entitle a claimant to relief if the claimant demonstrates prejudice, the Fifth Circuit relied on the former Fifth Circuit opinion in *Hall*, which was decided on September 9, 1981. *See Newton*, 209 F.3d at 459. The Eleventh Circuit has adopted as binding precedent all of the decisions of the former Fifth Circuit rendered prior to the close of business on September 30, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*). Since the Fifth Circuit relies on a former Fifth Circuit opinion in holding that HALLEX violations may be considered, it is possible that the Eleventh Circuit might apply the Fifth Circuit standard. *See Howard v. Astrue*, 505 F. Supp. 2d 1298, 1302 (S.D. Ala. 2007) (applying *Hall* and *Newton* and finding that plaintiff was prejudiced by ALJ's failure to order a supplemental hearing as required by the HALLEX because plaintiff was deprived of the opportunity to cross-examine consultative physician on new findings). *But see McCoy v. Barnhart*, 309 F. Supp. 2d 1281, 1289 (D. Kan. 2004) (concluding that HALLEX provisions are not binding and do not provide a basis for the court to rule, and finding the Fifth Circuit's reliance on *Hall* in *Newton* to be misplaced because *Hall* dealt with a Social Security Ruling, not HALLEX).

AO 72A
(Rev.8/8
2)

HALLEX I-2-7-1 states the following:

> Most posthearing actions involve the development and receipt of additional evidence. When an Administrative Law Judge (ALJ) receives additional evidence after the hearing from a source other than the claimant or the claimant's representative, and proposes to admit the evidence into the record, the ALJ must proffer the evidence, i.e., give the claimant and representative the opportunity to examine the evidence and comment on, object to, or refute the evidence by submitting other evidence, requesting a supplemental hearing, or if required for a full and true disclosure of the facts, cross-examining the author (s) of the evidence. (See I-2-7-30, Proffer Procedures.) If the claimant has executed a Waiver of the Right to Examine Posthearing Evidence received by the ALJ after the hearing, then the proffer procedures do not need to be followed. (See I-2-7-15 - Waiver of the Right to Examine Posthearing Evidence and I-2-6-1 - Hearings - General.)

HALLEX I-2-7-1, 1993 WL 751906 (SSA Sept. 2, 2005 ).

There was no need for the Commissioner to tender evidence of his updated earnings records to Plaintiff for comment. First, Plaintiff already would have been in possession of evidence related to his earnings for late 2005 and early 2006 at the time of the hearing before the ALJ. Pursuant to 20 C.F.R. § 416.708(c),[14] Plaintiff was

---

[14]     20 C.F.R. § 416.708 (c) provides in part:

(c) *A change in income.* You must report to us any increase or decrease in your income, and any increase or decrease in the income of -

. . .

      (2) Your essential person[.]

AO 72A
(Rev.8/8
2)

obligated to report any income he earned after his November 20, 2003 application. Evidently, Plaintiff chose not to do so. Second, Plaintiff was specifically advised at the time he filed his application that the Agency would compare his earnings statements with the Agency records and records from other state and federal agencies, including the Internal Revenue Service. (R82). Thus, Plaintiff was on notice that the Agency would obtain his earnings statements.

Finally, the Court concludes that prejudice does not exist because the VE did not rely on the earnings statements to show that Plaintiff could engage in substantial gainful activity. Rather, the ALJ relied on and the jobs identified by the VE. (R26). The ALJ did point out that Plaintiff's work efforts in the first quarter of 2006 was "consistent with performance of substantial gainful activity." (R19). However, the ALJ then went on to apply the sequential evaluation to determine that Plaintiff was not disabled. Thus, Plaintiff cannot show that he was prejudiced because the ALJ failed to tender his updated earnings record to him for comment.

Accordingly, the Court **AFFIRMS** the Commissioner's decision on this claim.

### B. *The ALJ's Consideration of Plaintiff's Treating Psychiatrist*

Plaintiff argues that the ALJ improperly discounted the opinion of Dr. Ekwenchi. (Doc. 11 at 16-21). Specifically, Plaintiff argues that Dr. Ekwenchi's assessment is

AO 72A
(Rev.8/8
2)

supported by the medical records from CCOCS. (*Id*. at 18-20). Plaintiff also argues

that the ALJ improperly credited the opinion of Dr. Esmail, who is not a psychiatrist

and only saw Plaintiff on one occasion. (*Id.* at 20). Finally, Plaintiff argues that

Dr. Ekwenchi's opinion is consistent with that the new evidence from CCOCS, namely

Dr. Cathy Williams's April 2007 medical impairment questionnaire, which was

submitted to the Appeals Council. (*Id*. at 20-21).

Defendant responds that the ALJ properly considered the opinion of

Dr. Ekwenchi, along with other evidence, and concluded that Plaintiff's depression

would not impose significant limitations on his ability to work. (Doc. 13 at 6-10).

A treating physician's opinion "must be given substantial or considerable weight

unless 'good cause' is shown to the contrary." *Crawford v. Comm'r of Soc. Sec.*,

363 F.3d 1155, 1159 (11th Cir. 2004) (quoting *Lewis*, 125 F.3d at 1440); *see also*

20 C.F.R. § 404.1527(d)(2). "Good cause" exists when the: (1) treating physician's

opinion was not bolstered by the evidence; (2) evidence supported a contrary finding;

or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own

medical records. *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004). The ALJ

must clearly articulate the reasons for giving less weight to the treating physician's

opinion, *Lewis*, 125 F.3d at 1440, by "always giv[ing] good reasons in the notice of the

33

. . . decision for the weight given to a treating source's medical opinion(s)." Social

Security Ruling (SSR) 96-2p.[15]  Thus, when the decision is not fully favorable to a

claimant, the ALJ's decision "must contain specific reasons for the weight given to the

treating source's medical opinion, supported by the evidence in the case record, and

must be sufficiently specific to make clear to any subsequent reviewers the weight the

adjudicator gave to the treating source's medical opinion and the reasons for that

weight."  *Id.*  If the ALJ ignores or fails to properly refute the treating physician's

opinion, the treating physician's opinion is deemed to be true as a matter of law.

*MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).

---

[15]     The Social Security Rulings are published under the authority of the Commissioner of Social Security and are binding on all components of the administrative process.  *See Sullivan v. Zebley*, 493 U.S. 521, 530 n.9 (1990); *see also Tauber v. Barnhart*, 438 F. Supp. 2d 1366, 1377 n.6 (N.D. Ga. 2006) (citing 20 C.F.R. § 402.35(b)(1)).  Although SSRs do not have the force of law, they are entitled to deference so long as they are consistent with the Social Security Act and regulations. *Massachi v. Astrue*, 486 F.3d 1149, 1152 n.6 (9th Cir. 2007); *see also Salamalekis v. Commissioner of Social Sec.*, 221 F.3d 828, 832 (6th Cir. 2000) ("If a Social Security Ruling presents a reasonable construction of an ambiguous provision of the Act or the agency's regulations, we usually defer to the SSR."); *State of Minn. v. Apfel*, 151 F.3d 742, 748 (8th Cir. 1998) ("Social Security Rulings, although entitled to deference, are not binding or conclusive."); *Pass v. Chater*, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995); *Gordon v. Shalala*, 55 F.3d 101, 105 (2d Cir. 1995); *Andrade v. Sec'y of Health and Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993).

AO 72A
(Rev.8/8
2)

Additionally, the opinion of a specialist is generally entitled to more weight than the opinions of other non-specialists. *Kerwick v. Comm'r of Soc. Sec.*, 154 Fed. Appx. 863, 864 (11th Cir. 2005); *see also* 20 C.F.R. § 404.1527(d)(5). However, the ALJ must "always consider the medical opinions in [the] case record together with the rest of the relevant evidence . . . receive[d]." *Id*. § 404.1527(b).

The Court finds that substantial evidence supports the ALJ's finding that Plaintiff's depression was not as limiting as concluded by Dr. Ekwenchi in his mental impairment questionnaire. In her opinion, the ALJ properly evaluated the mental impairment questionnaire completed by Dr. Ekwenchi. (R22, 261-66). The ALJ correctly noted that Dr. Ekwenchi's psychiatric opinion was provided after "no more than one visit" and lacked "the advantage of a longitudinal study" because mental health records showed that Plaintiff refused treatment for depression, threatened staff members who failed to comply with his request for disability documentation, and "used the agency as a source for food and assistance while he remained home (despite having friends and jobs)." (*Id.*). Further, the ALJ noted that a review of the entire record showed "little evidence" of depression because Plaintiff was able to perform as a spokesman for a child advocacy group, work at a series of jobs, enjoyed reading and writing, and persisted in receiving community services. (*Id.*). In addition, the ALJ

35

AO 72A
(Rev.8/8
2)

noted that there was no evidence that Plaintiff suffered from decompensation for extended periods. (*Id.*).

The Court also finds that the ALJ did take into account the records from CCOCS in discounting the opinion of Dr. Ekwenchi. (R21-22). The ALJ pointed out that Plaintiff was seen on two occasions at his "local mental health community center" - - CCOCS - - and while in group therapy for depression, blamed the government for his depression. (*Id.* at 21-22, 357). The ALJ also noted that Plaintiff's request for a completed mental health questionnaire was denied because he had not been seen by the psychiatrist and failed to follow through with treatment. (*Id.* at 21, 355). The ALJ further pointed out that Plaintiff reestablished treatment at CCOCS, but was said to have a very negative and "poor me" attitude. (*Id.* at 21, 348). Moreover, Plaintiff refused group therapy, but did cooperate with housing, employment and access to medical care assistance. (*Id.* at 22, 347). Thus, the ALJ properly took into account the records from CCOCS in evaluating Dr. Ekwenchi's mental status questionnaire.

Next, the Court concludes that Plaintiff contentions that the ALJ improperly relied on the opinion of Dr. Esmail to discount the opinion of Dr. Ekwenchi are without merit. The ALJ did note Dr. Esmail's treatment notes in her opinion. (R22, 247-52). The ALJ noted that Plaintiff denied any mental problems when seen by Dr. Esmail.

36

(R22).  The ALJ also noted that Dr. Esmail found no evidence of depression and good memory and concentration.  (*Id*.).  Further, Dr. Esmail found that Plaintiff suffered from a long history of substance abuse.  (*Id*.).  This evidence was not cited to discount the opinion of Dr. Ekwenchi, but rather was merely illustrative that the medical record as whole did not support Plaintiff's claim that he suffered from disabling depression.  *See Daughtry v. Barnhart*, 347 F. Supp. 2d 1135, 1140 (M.D. Ala. 2004) (holding that the ALJ's reasons for rejecting the opinion of Plaintiff's treating physician met the "good cause" requirement because there was no objective medical evidence to support the conclusion that the plaintiff's fibromyalgia caused significant work-related limitations).  Thus, the ALJ did not err in noting Dr. Esmail's treatment notes in evaluating Plaintiff's complaints of disabling depression.

To the extent that Plaintiff argues that Dr. Ekwenchi's assessment is consistent with new evidence submitted to the Appeals Council, this argument has no merit. Generally, a claimant is allowed to present new evidence at each stage of the administrative process.  *See* 20 C.F.R. § 404.900(b); *Ingram v. Comm'r of Soc. Sec. Admin*., 496 F.3d 1253, 1260-61 (11th Cir. 2007).  The Appeals Council must consider new, material, and chronologically relevant evidence and must review the case if "the administrative law judge's action, findings, or conclusion is contrary to the weight of

37

the evidence currently of record." *Id*.; § 404.970(b). When a claimant properly presents new evidence to the Appeals Council, a reviewing court must consider whether that new evidence renders the denial of benefits erroneous[,]" pursuant to sentence four of § 405(g). *Bolen v. Astrue*, No. CA 07–516-C, 2008 WL 694712, * 4 (S.D. Ala. Mar. 12, 2008) (citing *Ingram*, 496 F.3d at 1262). Also, the new evidence must relate back to the time period on or before the date of the ALJ's decision. 20 C.F.R. § 404.970(b); *Barclay v. Comm'r of Soc. Sec. Admin.*, 274 Fed. Appx. 738, 743-44 (11th Cir. 2008).

Here, the Appeals Council considered Dr. Williams's April 2007 assessment and properly found that it did not provide a basis for changing the ALJ's decision. (R5). The Appeals Council specifically stated that it "considered the arguments in your letter dated May 17, 2007. However, the additional information does not warrant changing or reopening the Administrative Law Judge's decision." Thus, the Appeals Council did not err by failing to consider Dr. Williams April 2007 assessment of Plaintiff's mental condition.

Additionally, the Appeals Council did not err did not err in declining to review Dr. William's assessment because it is not material. Dr. Williams reported that she saw Plaintiff for treatment every two months for 20 to 30 minutes. (R381). She opined that

38

Plaintiff had marked limitations in activities of daily living, maintaining social functioning, and in concentration, persistence or pace with one or two episodes of decompensation. (R383). Dr. Williams also indicated that Plaintiff had a continued need for a highly supportive living arrangement and that he was likely to be absent from the workplace more than four days a month. (R384). Initially, the Court notes that no physician, including Dr. Ekwenchi, found Plaintiff's limitations as restrictive as those found by Dr. Williams.

Second, as discussed above, this assessment is inconsistent with Plaintiff's mental health records, his ability to perform as a spokesman for a child advocacy group, work at a series of jobs, persistence in receiving community services, and his denial of mental health problems.

Finally, as pointed out by the Commissioner, Dr. Williams report was not supported by any treatment notes. *See Quarles v. Barnhart*, No. 06-13663, 2006 WL 3369688, * 1 (11th Cir. Nov. 26, 2006) (holding that the ALJ properly gave little weight to the opinion of claimant's treating psychiatrist in part because his assessment and opinions were not accompanied by objective medical evidence and are not bolstered by the record); *see also Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991) (report of treating physician also "may be discounted when it is not accompanied

39

by objective medical evidence"). Thus, the Appeals Council did not err in failing to review Dr. Williams's April 2007 mental impairment assessment of Plaintiff.

Accordingly, because the ALJ properly discounted the opinion of Dr. Ekwenchi, the Court **AFFIRMS** the Commissioner's decision on this claim.

C. *Hypothetical Pose to the VE*

Plaintiff contends that the ALJ improperly found that there was other work in the national economy which Plaintiff could perform. (Doc. 11 at 21-25). Specifically, Plaintiff argues that the hypothetical posed to the VE did not comprehensively describe Plaintiff's limitations in that the hypothetical did not take into account Plaintiff's mental limitations. (*Id.*) Plaintiff also argues that the ALJ relied on an outdated state agency medical assessment in formulating the hypothetical to the VE. (*Id.*). Finally, Plaintiff argues that the ALJ did not include in the hypothetical posed to the VE Plaintiff's limitation against occasional stooping. (*Id.*).

The Commissioner responds that the hypothetical posed to the VE was accurate because the evidence does not indicate that Plaintiff had any mental limitations that would significantly limit his ability to perform work activity. (Doc. 13 at 11-14). Defendant also argues the that evidence does not support a finding that Plaintiff was unable to perform occasional stooping. (*Id.*).

AO 72A
(Rev.8/8
2)

The Court finds no error. "In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical which comprises all of the claimants impairments." *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002) (citing *Jones*, 190 F.3d at 1229). However, an ALJ is "not required to include findings in the hypothetical that the ALJ [has] properly rejected as unsupported." *Crawford*, 363 F.3d at 1161. For the reasons discussed in the Part VII.B above, the ALJ properly found that Plaintiff's mental limitations were not severe. Dr. Ekwenchi's assessment was not consistent with Plaintiff's mental health records. Dr. Williams's assessment, which was presented only to the Appeals Council, was not supported by any treatment notes, nor was her assessment supported by the record evidence. Thus, the ALJ properly excluded Plaintiff's mental impairments from the hypothetical posed to the ALJ.

The Court also concludes that the medical evidence supports the ALJ's assessment that the Plaintiff could perform occasional stooping. In her opinion, the ALJ noted that she adopted the July 2004 state agency physician's residual functional capacity assessment that Plaintiff could perform medium work. The ALJ pointed out that Plaintiff suffered neck and back pain following a fall while incarcerated. (R20, 112). The ALJ also noted that in April 2004, after Plaintiff had been released from

41

prison, Plaintiff was examined by Dr. Esmail, who found that Plaintiff had full muscle power and tone, his joints were normal, and his range of motion was good. (*Id*. at 20, 247-52). Dr. Esmail did note that Plaintiff had some tenderness on flexion of his neck and lumber spine on range of motion, but otherwise his shoulders and spine were normal. (*Id*.). The ALJ further noted that x-rays taken in October 2004 did show calcifications at C4-5 and C6-7. (R21, 267-68). However, lumbar x-rays showed preserved disc space with on mild loss of height at T11. (*Id*. at 21, 298-300). Further, physical examination by Dr. Brownlow showed normal gait and normal range of motion except for limited cervical extension. (*Id*.). As noted by the ALJ, (R24), there is no objective evidence in the record to show that Plaintiff had more than a slight limitation in his cervical and lumbar spine. Additionally, because the medical evidence supports only a slight limitation in the cervical and lumbar spine, the ALJ did not err by finding that Plaintiff could perform medium level work that required occasional stooping.[16]

---

[16] The court notes that records from Plaintiff's chiropractor support his contention that he is unable to perform occasional stopping. (R269-77, 233). However, the opinion of a chiropractor is not considered an "acceptable source" and is not accorded significant weight. 20 C.F.R. § 404.1513(a); *Crawford*, 363 F.3d at 1160 (finding that a chiropractor is not considered an "acceptable source" and, thus, his opinion cannot establish the existence of an impairment).

AO 72A
(Rev.8/8
2)

Accordingly, the Court **AFFIRMS** the Commissioner's decision on this claim.

## VIII.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner is **AFFIRMED**.  The Clerk is **DIRECTED** to enter judgment for Defendant.

**IT IS SO ORDERED and DIRECTED**, this the 30th day of September, 2008.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

AO 72A
(Rev.8/8
2)